Henry and others *v.* Travelers' Ins. Co.

*(Circuit Court, D. Colorado.* December 10, 1887.)

Contract—Construction.
>   Negotiations were carried on between plaintiff and his brother and the president and secretary of defendant, which resulted in a contract. the terms of which were not, however, reduced to writing. As to these, plaintiff testified, and he was corroborated by his brother, that the ditch companies in which defendant was interested should issue increased new bonds to the amount of $1,000,000, which they did, defendant to take new bonds for its old holdings as well as for advances already made, and in payment of loans to be made, and the obligations of the ditch companies indorsed to it by plaintiff should be surrendered. Defendant claimed that, until plaintiff had found customers for the excess of the new over the old bonds, and effected the exchange of bonds of the new series for those of the old, and transferred to defendant one-half the capital stock of the ditch companies, it was to hold all its obligations and liens as collateral. The evidence showed that defendant represented to other parties making inquiries as to these bonds and enterprises that it knew of no "special dangers" or "risks" attending them. Entries made on the books of defendant showed the receipt of new bonds in payment and discharge of advances to the ditch companies; and in its annual statement for 1884, and in that for 1885, sworn to by its officers, are enumerated, under "Account of stocks," etc., new bonds, not merely covering old holdings of bonds, but also defendant's other advances. From letters of defendant it further appeared that it expected to make advances to the amount of $150,000. *Held,* that the evidence sufficiently established a contract substantially as testified to by plaintiff; that the notes and obligations to it indorsed by plaintiff had been paid and satisfied, and should be surrendered; that all securities held simply as collateral should be returned; and that complainants were entitled to an accounting.

Bill to Establish a Contract, for its performance, and an accounting.

*J. P. Brockway, Patterson & Thomas,* and *J. L. Jerome,* for complainants.

*E. O. Wolcott, C. H. Toll,* and *J. F. Vaile,* for defendant.

Brewer, J. This is a bill filed by the complainants for the purpose, in brief, of establishing and enforcing a contract, and obtaining an accounting. A large volume of testimony has been taken, very careful abstracts prepared and printed, and full argument, oral and written, presented. I have had the case under advisement for some months, and, from such examination, have been led to the following conclusions: A brief statement of the relations between the parties prior to the time of the alleged contract will help to a clearer understanding of the question, and the weight to be given to the different items of testimony.

Defendant is an insurance company located at Hartford, Connecticut, with a large amount of funds for which it is seeking safe investments with the best interest. Prior to 1883 the complainant, T. C. Henry, had been for years living at Abilene, Kansas, engaged in the real-estate and loan business. He had established confidential relations with defendant, and for it, as well as others, had loaned large amounts in the state of Kansas. Up to that time his relations with defendant were satisfactory to both parties, and evidently the defendant had great confidence in his ability and judgment. In the spring of 1883 he came to Colorado, and established himself in business here, without, however, wholly abandoning his business in Abilene. One George W. Carpenter, who had been his clerk, was taken into partnership, and under the firm name of T. C. Henry & Co. the Abilene business was continued. On his location in Denver he opened correspondence with defendant, and succeeded in inducing it to make several real-estate loans in this state. In order, as he supposed, to facilitate the business, he organized the Colorado Loan & Trust Company, of which he was the president and practically the owner. Indeed, so intimate were the relations of this loan and trust company and T. C. Henry that, for all the purposes of this case, they may be considered as one; and hereafter, in general, I shall treat the acts of either as the acts of T. C. Henry.

Besides his loan business, Mr. Henry engaged in several enterprises, the earlier of which it is unnecessary to consider. In the fall of 1883 he became interested in certain irrigating canals or ditch enterprises in different parts of Colorado, and out of this springs this litigation.

The four ditch companies which gave occasion to this controversy, and which are joined as complainants with T. C. Henry, are the Grand River Ditch Company, the Uncompahgre Canal Company, the Citizen's Ditch & Land Company, and the Del Norte Land & Canal Company. In these companies he became largely interested by virtue of his purchase of stock, and by engaging as contractor to construct and complete their various ditches and canals. Each of these companies had issued bonds, some of which defendant purchased and owned absolutely; others of which were placed among different parties in the east. The moneys received from these issues of bonds were insufficient for the completion of the work contemplated, and Mr. Henry soon found that the funds of the various companies were exhausted, the work incomplete, and he was drawing on his own resources and issuing his own obligations for the purpose of completing the canals. It is, perhaps, unnecessary to go into details as to the reasons for this condition of affairs. It is enough to say that the estimates of the engineers proved unreliable, the cost of the work was greater than their estimates, and in some cases extensions, not originally contemplated, were finally determined upon. It is enough to say that the work was incomplete, and the funds exhausted.

In this condition of affairs Mr. Henry applied to defendant for a loan of $250,000, some of which he represented was needed by him for his personal interests, but the major portion for the completion of these several canals. In order to secure this loan he made an exhibit of his finan-

cial condition, of the securities which he had to offer, as well as the purposes for which the money was desired. After some hesitation, defendant voted the loan, taking therefor, among other securities, the obligations of the various ditch companies made to T. C. Henry, and by him indorsed to defendant. This was in the spring of 1884.

Before full payment of this loan had been made to him, and in the early part of the summer of 1884, he discovered that, notwithstanding this enormous loan, the necessities of the ditch companies demanded more money, and communicated the fact to defendant. Soon after receiving the news of this unexpected development, Mr. Dennis, the secretary of defendant, came to Colorado to examine the situation. After an examination by him, defendant advanced more money, taking the obligations of the various ditch companies with Mr. Henry's indorsement. Things progressed in this way for some time. The situation of affairs was embarrassing to all parties. Mr. Henry's personal financial condition was one of great embarrassment. The work on the canals was incomplete. Defendant had advanced large sums of money, and felt that its investments in this direction were, to say the least, in an unsatisfactory, if not in a critical, condition. Finally, in the fall, about the first of November, 1884, at the instance of defendant, as he says, Mr. Henry went to Hartford to consult with the officers of defendant, and to see if some plan could not be devised to extricate all parties from the embarrassments which surrounded them. He was there some four or five weeks, engaged in consultation, and, as he claims, their consultation culminated in a contract, and the existence and terms of that contract constitute the pivotal facts of this litigation.

There is considerable testimony as to the alleged misconduct, on the part of Henry in his loan business in Kansas, as well as that in Colorado; but in the view I take of the controversy, and the pivotal fact in it, I think it unnecessary for me to comment on that testimony, or to consider whether these charges of misconduct are proven or not. Their existence, or a belief in their existence, is only significant as throwing light upon the negotiations between the parties during the four or five weeks, and at the time of the making of the alleged contract.

I pass, therefore, to a consideration of the testimony which bears directly upon this contract. Mr. Henry was accompanied by his brother, S. O. Henry, and the negotiations were carried on between the two brothers Henry, and Mr. J. G. Batterson, president, and Mr. Rodney Dennis, secretary, of defendant. At least, they were the principal parties thereto. It is well to remember the situation of the parties at the time of this alleged agreement. As heretofore stated, each of the ditch companies had issued a limited number of bonds, some of which were owned by defendant, others scattered around among various individuals in the east. Besides its investments in these bonds, defendant had advanced money, for which it had obligations of the ditch companies indorsed by Mr. Henry. It had also become the owner of certain mechanics' liens upon the ditch companies' properties. The work on the various canals was incomplete. More money was needed for their completion, and

probably more money for keeping them up until such time as, by the selling of water-rights or the rental of water privileges, sufficient income would be derived from them to pay operating expenses, as well as the interest on their indebtedness.

It was agreed between the parties that the various ditch companies should issue new and larger series of bonds, and in the following amounts: The Del Norte Land & Canal Company, $400,000; the Citizens' Ditch Company, $200,000; the Grand River Ditch Company, $200,000; and the Uncompahgre Company, also, $200,000,—or a million of bonds altogether. Thus far there is no dispute, and in fact the bonds were prepared and issued; the vice-president of defendant being named as trustee and custodian of these new issues.

Now, Mr. Henry claims that it was also agreed that the defendant should take for bonds of the old issues which it owned an equal amount of bonds of the new issues; further, that he and the defendant should endeavor to persuade other holders of bonds of the old issues to exchange their bonds for an equal amount of bonds of the new issues; also that defendant should take bonds of the new issues in payment for all advancements made by it for the benefit of the ditch companies, thus substituting such new bonds for the mechanics' liens, as well as the obligations of the ditch companies with Mr. Henry's indorsement held by it, the effect of which would be to relieve Mr. Henry from all liability on paper held by defendant and given in any way for advancements made to or for the benefit of the ditch companies; further, that it would advance money for the completion of the work, and take bonds of the new issues in payment for such advancements. The effect of this arrangement would be the securing of funds to complete the canals, the funding of all their indebtedness in one series of bonds owned by defendant and other holders of the old bonds, and also releasing Mr. Henry from the personal liability incurred by him on behalf of these ditch companies. Was such an agreement entered into? Mr. Henry says that it was. I quote his testimony. This question was asked: "You may state, further, in full the agreement with reference to this refunding." To which he answered: "It was agreed that the Travelers' Insurance Company should take bonds at par of the new issues for bonds which they already held of the several canals in Colorado; bonds at par for advancements already made by them, and bonds at par for all advancements which they proposed to make for the accruing interest on the old bonds, for the proposed construction and operation and maintenance of the canals for the ensuing year." He was then asked this question: "How about the notes and obligations signed by you, and for which you were responsible?" To which he answered: "They were to be canceled and retired, calculating interest up to the date of the new issues of bonds." He was further asked this question: "Was there not some arrangement made as to how and by what means the new issues of bonds were to be exchanged for the old issues? Was there anything said about that? Who was to do it, or how was it to be done?" To which he answered: "As stated, in connection with my trip east at that time I was to undertake to secure the consent of outside bondholders

to exchange at par their holding for an equal holding of the proposed new issues. That I did in the main, and succeeded in getting them all to agree to it." Then he was asked, "Was any aid to be given in this respect by the Travelers'?" To which he answered: "Yes, sir. They were equally interested with myself. And in some instances, where parties were not quite so accessible to myself, they were approached by Mr. Dennis, Mr. Batterson, or Mr. Davis, as the case might be. In fact, they saw fit to purchase the bonds in one or two instances in order to accomplish this exchange." Mr. Henry's testimony as to the substance of this agreement is corroborated by that of his brother, S. O. Henry. It is denied by Mr. Batterson and Mr. Dennis, the two representatives of defendant in this negotiation.

If the case stood here, it might well be said that, there being a direct conflict between the parties to the negotiation, the complainant has failed to prove the contract as he alleged it; and if there were no other testimony, I should have no hesitation in coming to that conclusion, especially in view of the fact that it is not pretended by Mr. Henry or his brother that this agreement was reduced to writing. Indeed, it cannot be considered otherwise than as strange that, when parties were negotiating about such vast interests, and negotiating for such a length of time, that the final and definite agreement between them was not placed in writing, but left to the uncertain understanding and memory of the parties thereto. That, certainly, is not the ordinary way in which business is transacted, and the failure to produce such a written agreement, it must be conceded, throws doubt on the testimony of complainant and his brother. But oftentimes the situation of the parties, and the necessity springing out of that situation, as well as their subsequent conduct, throw much light upon the question as to whether a contract was definitely entered into, as well as to what were its terms, and to that in this case we must look.

That there was some contract entered into by the parties, is evident from the testimony, as well as conceded by defendant. Indeed, it would be strange, in view of the embarrassing situation in which both parties stood, in view of the fact that Mr. Henry went on for the purpose of making some new arrangement, and remained for several weeks in consultation with defendant, that the parties should separate without coming to some agreement. That they did agree is evident from the fact that the ditch companies immediately made arrangements to issue new bonds, making the vice-president of defendant trustee, and that the arrangements therefore were conducted under the supervision, or at least with the knowledge of, the officers of defendant. But, indeed, the making of a contract is conceded by defendant, and the only question is as to its terms.

I have given the testimony of Mr. Henry in respect to this contract. I now quote what defendant says in the amended answer, which it tendered for filing, and which, being its last statement, must be taken as a declaration of the full terms of the contract as it understood them. It says:

"And the defendant further, by way of supplemental answer, alleges that, at the time defendant consented to an increase of bonds of the various canal companies, in the bill of complaint mentioned, and as in the original is hereinbefore set out, it was further agreed and understood by and between this defendant and the said T. C. Henry, acting in his own behalf and for said various canal companies, that, upon condition that the said T. C. Henry should find new customers for the excess of such new issue of bonds, over the amount required to take up the old issue of bonds, thereby obtaining new capital for the further construction and operation of said canals, and upon condition that said Henry should effect the exchange of said new issues of bonds for bonds of the old issues among holders thereof other than this defendant, and upon the further condition that said Henry should transfer, or cause to be transferred, to this defendant one-half of the capital stock of each of said canal companies, to-wit, the Uncompahgre Canal Company, the Grand River Ditch & Land Company, and the Del Norte Land & Canal Company, to be absolutely owned and held by this defendant, that then said defendant would receive bonds of said new issues in said several companies in exchange for their previous holding of such bonds, and on account of advances by them heretofore made for the construction and operation of said canals, some of which advances were then represented by mechanics' liens. And this defendant alleges that it was expressly understood and agreed by and between the said T. C. Henry and this defendant that until the said T. C. Henry should comply with his part of said agreement, that all obligations of said several canal companies and all liens at that time held by said defendant upon said canals, or any of them, and all other collateral security by them held on account of obligations of said canal companies, should continue to be and remain as collateral security in the hands of this defendant."

Now, analyzing this statement of the contract, it will be seen that in some respects it agrees with the claim made by complainant. *First.* New series of bonds were to be issued. *Second.* Defendant was to exchange its holding of old bonds for bonds of the new issues. *Third.* That it would receive bonds of the new issues on account of advances already made by it for the construction and operation of the canals. Thus far the parties agree. They differ in this: Defendant insists: *First.* That Henry was to find new customers for the excess of the new issues of bonds over the old issues. In other words, he was to sell said new issues of bonds for the purpose of securing capital for the completion of the canals. *Second.* It claims that Henry was to effect the exchange of bonds of the new issues for those of the old issues held by others than defendant. *Third.* That he should transfer to defendant one-half the capital stock of these canal companies, to be held by it as its absolute property. And, *fourth.* That until this was fully performed, defendant was to hold all its obligations of the canal companies, and all liens on the canals, and all other securities as collateral. So far as this case is concerned, the vital matter of difference is in this last matter; for the company admits that it was to take new bonds for its old holding, as well as for advances already made.

Now, were these new bonds to be taken as payment, or simply as collateral until everything Henry was to do had been performed? In other words, were they to remain in the hands of the company as collateral, until Henry had exchanged all of the old bonds outstanding in other parties' hands, had negotiated the balance of the new bonds to third parties,

and thereby put so much outside money into the work of constructing and completing the canals, and had also turned over absolutely the one-half of the stock of the canal companies? That such was not the contract is clear to my mind from three things: *First.* Such an arrangement would be a fraud upon the other holders of old bonds who were to be induced to exchange them for bonds of the new issues. *Second.* It is contrary to representations made by the officers of said company to some of such holders. And, *third*, it is against the sworn statement made by officers of defendant to various insurance superintendents in their annual reports of 1885 and 1886. Of these in their order.

Take the Grand River Ditch Company for illustration. Defendant held $37,000 of its bonds, and held an additional $25,000 of mechanics' liens and floating debts. The first issue amounted to $85,000. The proposition was to increase to $200,000. Of the old issue George P. Bissell & Co. owned $20,000, or nearly one-fourth of the total amount. According to defendant's claim, he was to be induced to exchange those for $20,000 of the new issue, or only one-tenth of the total amount. Now, if Mr. Henry failed to sell all the excess of the new issues, as he did fail, and as very reasonably he might be expected to fail, then Bissell & Co. would be left with one-tenth of a series of bonds issued after the filing of mechanics' liens to which they would be certainly inferior in right, in lieu of one-fourth of the series of bonds which were issued at a time and under circumstances which might give them equities superior to all these liens, and certainly superior to all floating debts. Can it be thought for a moment that defendant was party to a scheme by which other holders of bonds were to jeopardize their interests in that way, risking so much on the chance of Henry's negotiating so many new bonds of an enterprise of as speculative a character as a ditch and canal company in Colorado? And yet, if we are to credit this claim of defendant, no matter what exchanges were made, it was to hold all its liens and securities unimpaired until a final completion by Henry of the negotiation of the entire new issues.

*Secondly,* Pending the exchange of the old for the new bonds, certain parties wrote at length inquiring of defendant with respect to these securities. For instance, on February 6, 1885, the secretary of defendant wrote to the Eastern Banking Company of Boston, in response to a letter of inquiry in respect to the new bonds, as follows: "These bonds ought to be fully as good as conservative western loans. In many respects they are to be preferred to real-estate mortgages, inasmuch as the control of the water makes the crops more secure. I do not know of any 'special dangers' or 'risks' attending these bonds and enterprises." This language is not compatible with the idea of continuing the existence of paramount mechanics' liens; for no man could say, with such outstanding that there were not "special dangers" and "risks" attending the bonds.

On May 30, 1885, after defendant had received, as it claims, knowledge of the misconduct of complainant, Spencer, Trask & Co., of Providence, Rhode Island, wrote to it making inquiry concerning him and

his irrigation enterprises. This was after defendant had withdrawn its collections from the Colorado Loan & Trust Company. The letter contains this language:

"Of course, we know that Mr. Henry has been embarrassed and harassed, and understand that the motives which induce your business policy are exclusively your own, yet, in a general way, we are compelled to make inquiry the neglect of which would force us to most unwilling conclusions. Will you therefore kindly advise us by return mail—*First*, whether your confidence in Mr. Henry's integrity continues unimpaired? *Second,* in his negotiations has there been material misrepresentations of facts through probable ignorance or other cause? We should not be quoted if you felt inclined to tell us if you think his irrigation enterprises have a solid ultimate value, and whether it is your purpose to advance yourself further in his service and in connection with your interests in his state."

To this letter, on June 1st, defendant, by its secretary, answered, and in the letter are to be found these words:

"In view of the complications surrounding this matter, we had much rather answer in a personal interview, with its better opportunities for comment and explanation, than to answer in a written letter. Over a term of five or six years, and until Mr. Henry left the state of Kansas, this company did a very large amount of business with him with great satisfaction. Mr. Henry's Colorado enterprises have greatly embarrassed him, for the reason that he has undertaken far more than one man could possibly expect to manage successfully. We think Mr. Henry's irrigation schemes have a solid basis of merit, but he has been over-sanguine, and honestly discounted the future to an extent likely to disappoint himself and his friends in some cases and to some extent. Mr. Henry has been obliged to absent himself from the immediate charge of his important and pressing enterprises, and he has suffered from not having sufficiently capable and trustworthy agents and associates. Had Mr. Henry been at the business head of the Denver office, we should not have taken therefrom the collection of our interest."

*Third.* Beyond the entries made on the books of defendant which tend to show the receipt of new bonds in payment and discharge of advances to the ditch companies, in the annual statement for the year ending December 31, 1884, and also for that ending December 31, 1885, are new bonds of these canal companies covering not merely the old holding of bonds, but also defendant's other advances. These statements were prepared for distribution, and were in fact distributed to the insurance superintendents of the several states. These bonds appear in Schedule E, which is headed, "Account of stock, bonds, and treasury notes of the United States, and of this State and of other States, and also of all other stock and bonds absolutely owned by the company." And at the close is this verification: "*State of Connecticut, County of Hartford:* I, J. G. Batterson, president, and Rodney Dennis, secretary, of the Travelers' Life Insurance Company, being duly sworn, depose and say, and each for himself says, that they are the above-described officers of said company, and that on the thirty-first day of December last all of the above-described assets were the absolute property of said company, free and clear from all liens or claims thereon, except as above stated," etc.; which statement is signed and sworn to by the gentlemen named.

The first of these statements was prepared, as it would seem, within a few weeks of the making of this contract, and the second after the commencement of this suit, by which defendant was notified of the claim of complainant that these bonds were taken absolutely in payment for these advances. These two statements are to my mind very convincing as to what the contract really was. The explanation made by the president and secretary of defendant is not satisfactory. They say that they expected that Henry would comply with his contract, and that they made these statements in anticipation of the performance by him. It seems more reasonable to believe that they were made—the one so shortly after the contract—with the understanding, as now sworn to by Mr. Henry, that the bonds were taken, and were to be taken as present and absolute payment of these advancements.

In addition to this there are two or three letters written by under-officers of defendant to the Colorado Loan & Trust Company, or its secretary, which indicate the receipt of the bonds and the balancing up of some of the accounts or advances. These, of course, are not so significant as these sworn statements of the president and secretary, because, having been written by under-officers, they might have been written under a misapprehension of the real facts. There is the testimony of S. O. Henry that he called upon the book-keeper, and also upon Mr. Dennis, the secretary, for the return of some of the notes of his brother, the complainant, which he supposed had been satisfied by the new bonds and was told by them that the notes were canceled, but that the company desired to keep them as *memoranda* until the final closing up of the transaction. This, however, is denied, and so I place little separate reliance upon it.

But it may be asked, what was the company to gain by this arrangement, and why should it surrender any collateral which it held? It held obligations against the canal companies in three ways: *First*, bonds; *second*, mechanics' liens; *third*, notes indorsed by Henry. In the *first* place, it put all its claims into better shape, reduced them to the single item of bonds,—something which would show well in their statements of assets submitted to the insurance superintendents and to the general public. *Second*, it really released nothing but the personal liability of Henry. It had, outside of the obligations of the canal companies indorsed by Henry, large claims against him, and of his probable insolvency it then had but little doubt. *Third*, by the advancements which it contemplated, the canal properties would be finished and put into good shape to earn an income, which as yet they had failed to do. *Fourth*, it evidently had great confidence in Mr. Henry's ability to push the canal schemes and make them a success, and feared disaster to itself if he threw up the enterprises.

It may also be said that, under the contract as claimed by Henry, defendant was called upon to invest more money in these enterprises, and take additional bonds, and that it could hardly be expected that it would have been willing to put more money into these ventures then seeming so doubtful. In reply to that it may be observed that the necessity for

more money was apparent, and that defendant, as having the largest investment, must have felt that it would have to put in more money to protect that which it already had invested. In the second place, it is evident from the letters of the company, that it expected to make advances. In a letter from the president, of date November 11, 1884, to Mr. Henry, and which is one of a series of letters, which, as will be seen hereafter, defendant relies upon as constituting a contract in writing, the writer says: "The third stipulation proposes that you make such provision on or before April 1, 1885, as will effectually relieve this company from the necessity of making any further advances than have already been made," etc. Then we shall for "the consideration of $300,-000 reconvey," etc. "But it does not appear to be within your power to make the provision required for such relief, and as it is certain that immediate advancements must be made, we cannot agree to the third stipulation." And again, in the same letter: "The entire amount of future advances to be made by the Travelers' Insurance Company on account of all the aforesaid enterprises submitted by you, is limited to the round sum of $150,000, the detailed apportionment and payment of which shall be the subject of a separate *memoranda*, and the amount to be advanced shall in all cases be subject to the discretion of the finance committee of the Travelers' Insurance Company."

It also appears that Mr. Bronk was sent out to Denver to represent especially the defendant, so that while it may well be that the amount of advances was to be determined by defendant, and that the extent of expenditures in the way of work on the canals was not to be left alone to the discretion and management of Henry, yet it is very evident that the Travelers' Insurance Company contemplated and expected to advance large sums towards the completion of these canals, and for the protection of its own interests.

I pass now to a consideration of the matter set up by defendant as constituting a written agreement which consists—*First*, in the written report made by a committee of the directory of the Travelers' Insurance Company, after consultation with Mr. Henry, and of date November 5, 1884, in which the increase of the bonded indebtedness of the canal companies was recommended, the completion of the work, etc.; *second*, a letter from Mr. Henry of date November 4, 1884, to President Batterson, submitting three amendments to that report; *third*, a letter of November 11th, from President Batterson to Mr. Henry, declining these proposed amendments, and making certain propositions; and, *fourth*, a paper, without date or signature, which reads as follows:

"Having read the letter signed by President Batterson and Secretary Dennis, dated November 11, 1884, and a *memoranda* thereto annexed, dated November the twelfth instant, I hereby signify both for myself, for Henry and Aldrich, and for the Colorado Loan & Trust Company, our joint and several acceptance of the various stipulations and conditions therein contained, and we jointly and severally also agree that the Travelers' Insurance Company may appoint an agent or attorney who shall act with us in the management of all lands and canal companies referred to in said letter and said *memoranda* under the conditions therein specified."

As I said, this paper contains no date nor signature, and Mr. Henry testifies that he never saw nor signed any such paper. Mr. Batterson testifies that Mr. Henry came into his office with such a paper in his own handwriting, and that it was handed to a type-writer, who made two copies, and that one of them was signed by Henry and handed to him. That thereafter S. O. Henry, he presumes, carried off the copy signed by his brother. This, S. O. Henry denies. Of course, this testimony, by itself, leaves the execution of this paper a matter of dispute. Other matters, however, weigh very materially against the claim of Mr. Batterson. If such a paper was executed, closing a contract involving so much money and such large interests, it is common experience that it would have been placed away carefully for future use and reference. As a matter of fact, it seems to have been forgotten. The president does not pretend to have seen or searched for it from the time of its execution in November, 1884, until the summer of 1886, and then upon examination only this unsigned paper could be found. No reference is made in any letter or conversation to the existence of this written contract as determining the rights and obligations of the various parties. The answer, which was sworn to October 15, 1885, and filed soon thereafter, contains no reference to it. Nor does its existence appear to have been known to the defendant's attorneys until in the fall of 1886, when engaged in taking testimony. Again, the amount of bonds of at least two of these companies, which were issued right away after this time, were each $50,000 in excess of the sum named in these papers. Again, on the face of these papers, as I have already noticed, appears a clear intimation of the purpose and expectation of the Travelers' Insurance Company to make further advances, which now defendant says were to be obtained by Mr. Henry from the sale of the extra bonds. Putting all these things together, it must be held that the testimony tending to establish this as the consummation of a written contract is very unsatisfactory, and I have little doubt in coming to the conclusion that this last letter was not signed by Mr. Henry, and that the series of letters does not evidence the real contract.

There are one or two other matters that require notice. One is that Mr. Henry, according to the testimony of two or three witnesses, made a statement some time after this contract to the effect that all his assets were tied up in the hands of defendant; and, second, that in a letter to it he complains that it had not done him the favor of releasing a security held by it. But this is susceptible of very easy explanation. The truth is that, outside of all advances made by defendant on account of the ditch companies, it had loaned Mr. Henry on other accounts large sums, and for them it had a pledge of all his known assets as security.

There are other matters of testimony which have influenced me on the one side or other towards the conclusion which I have reached. I have already protracted this opinion to great length, and I think it would avail little to attempt to mention these others which, in my judgment, are minor matters.

As indicated heretofore, that which has controlled my judgment more than all else is the official action of defendant's officers, their statements,

letters, and books. These things, I think, are more to be considered than any oral testimony or recollection of witnesses, and my conclusion is that a contract was made substantially as stated by Henry,—a contract by which the company agreed to take new bonds for its holding of old bonds, and for all advances which it had made or should make on account of these ditch companies, no matter how they were evidenced or by what security. As these bonds have, according to a letter from the trustee, the vice-president of defendant company, been, in a large measure, passed into the custody of the defendant, it follows that the notes and obligations of the ditch companies, with the indorsement of Mr. Henry, have been paid and satisfied, and should be surrendered, and that all securities which were held simply as collateral for these obligations should be returned. Of course, it is not claimed that this contract reaches to any matter outside the obligations of the ditch companies, or that the private debts of Mr. Henry were in any way discharged or to be affected by it.

A decree will therefore go in accordance with this conclusion,—a decree establishing a contract as above stated, and directing an accounting. The matter will be referred to a master to state the account. This account will state the various sums advanced on account of or for the expenses of the ditch companies, the evidences of debt given therefor, the securities placed as collateral therefor, and the disposition made by defendant of any and all of them; also, the number of bonds received by defendant, and the time of their receipt. On the coming in of the master's report, a decree will be entered such as the facts shown by that report will justify.